260 So.2d 46 (1972)
Ewell J. THIBODEAUX, Plaintiff and Appellee,
v.
ASSOCIATED DISTRIBUTING COMPANY, Inc., Defendant and Appellant.
No. 3730.
Court of Appeal of Louisiana, Third Circuit.
March 2, 1972.
Rehearing Denied April 18, 1972.
Writ Refused May 30, 1972.
*47 Leon E. Roy, Jr., New Iberia, for defendant-appellant.
Harry S. H. Verlander, Jr., New Orleans, for appellant.
C. Kenneth Deshotel, Opelousas, for plaintiff-appellee.
Before FRUGÉ, HOOD and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a workmen's compensation case. While employed as a "can strapper" in defendant's canning factory, plaintiff slipped and fell on his right shoulder, causing a massive tear in the rotator cuff muscle. The district judge awarded plaintiff benefits for total and permanent disability, together with penalties and attorney's fees. Defendant appealed. Plaintiff answered the appeal, seeking an increase in attorney's fees and a change in the rate of interest from 5% to 7% on past due installments.
The issues on appeal are: (1) Is plaintiff permanently and totally disabled beyond the period of 73 weeks for which compensation was paid? (2) Did plaintiff forfeit his right to further compensation benefits by refusing to submit to surgery? (3) Is plaintiff entitled to penalties and attorney's fees, and, if so, in what amount? (4) Where defendant is the employer, rather than an insurer, how is the 12% penalty computed? (5) Should the judgment provide interest at the rate *48 of 7%, instead of 5%, on each past due installment until paid?
The facts show that plaintiff is a white male, 48 years of age, with only a third grade education. His job in defendant's canning factory was classified as common labor. His principal duty was to receive cans from a conveyor belt, place them in a basket and carry them to a pressure cooker. He also worked in the warehouse, loading and unloading cases of cans, and this work required that he lift the cases above waist level. Additionally, he did maintenance work, such as hosing down and sweeping the cannery, cutting the grass outside, and using shovels, hoes and briar hooks.
Following the accident on October 2, 1968, plaintiff was first seen by Dr. C. L. Keller, a general practitioner of Churchpoint, Louisiana. After treating plaintiff's shoulder injury for about two weeks, Dr. Keller referred him to Dr. Frederick L. Mayer, an orthopedic surgeon in Opelousas.
Dr. Mayer first saw plaintiff on October 16, 1968, and diagnosed a strain or tear of the rotator cuff muscle of the right shoulder with tendonitis. The principal symptom was inability to raise the right arm over 45. Plaintiff was given conservative treatment, consisting of injections into the tendon at weekly intervals. When he did not improve substantially by November 8, 1968, Dr. Mayer decided the injury was massive tear of the rotator cuff muscle, which required surgical repair. On that date, Dr. Mayer recommended to plaintiff that he undergo surgery. He explained that it should be performed within about two months post-injury and the chances of success were 85% to 90%. Plaintiff was instructed to return within one week, but he did not do so.
Dr. Mayer next saw plaintiff on December 20, 1968, which was nine weeks post-injury, and again recommended that surgery be performed immediately. On this occasion, plaintiff refused the surgical repair, stating that he had talked to a friend who suffered a similar injury and recovered without surgery.
After plaintiff refused surgery, Dr. Mayer continued to administer conservative treatment, consisting of heat therapy and exercises. However, in a report to defendant's claim adjuster dated January 29, 1970, Dr. Mayer stated plaintiff could actively abduct his right arm to only about 60 and could not hold his arm up above 90 of abduction after it was passively elevated. Atrophy of the affected muscles was found. Using a chart, Dr. Mayer estimated 10% permanent physical impairment of the entire upper right extremity.
In his final report to defendant dated February 26, 1970, Dr. Mayer restated plaintiff would have a 10% permanent impairment of the right arm and added, "This, however, should not prevent him from engaging in gainful employment." On the basis of this report, workmen's compensation payments were terminated as of February 25, 1970.
THE DISABILITY ISSUE
We have little difficulty concluding that plaintiff is permanently and totally disabled from performing work which is the same or substantially similar to that which he was performing at the time of the accident. A common laborer is considered totally disabled, within the meaning of LSA-R.S. 23:1221(2), where his disability is such that he cannot compete with other able-bodied workers in the regular common labor market, Thomas v. Gates, Inc., La.App., 157 So.2d 263 (3rd Cir. 1963); Hebert v. South Louisiana Contractors, Inc., La.App., 238 So.2d 756 (1st Cir. 1970). A man who cannot raise his right arm more than 60 cannot use many tools or perform many tasks required of common laborers. It is obvious that such a worker cannot compete in the common labor market.
*49 REFUSAL TO SUBMIT TO SURGERY
As stated above, the accident occurred on October 2, 1968 and, on November 8, 1968, Dr. Mayer recommended to plaintiff surgical repair of the rotator cuff muscle. At that time, Dr. Mayer explained to plaintiff that the surgery, in order to be successful, would have to be performed within about two months post-injury and that the chances of success were 85% to 90%. Plaintiff refused to submit to surgery, stating that he had talked to a friend who suffered a similar injury and recovered without surgery.
The facts show that prior to the time workmen's compensation payments were terminated, no attempt was made by the defendant-employer to secure a judicial determination of the necessity and reasonableness of the surgery.
Jurisprudence has established the rule that an employer cannot ex parte terminate the payment of compensation upon the refusal of the employee to submit to surgery. And the burden is on the employer to obtain a judicial determination of the necessity of surgery. Furthermore, the question cannot even be presented to the courts until after the employer has made a firm tender of the medical treatment in question. See Murry v. Southern Pulpwood Insurance Co., La.App., 136 So.2d 165 (3rd Cir. 1961) and the authorities cited therein.
Defendant contends the jurisprudential rule stated above has no application in the present case where the success of the recommended surgery required that it be performed within about two months post-injury, and defendant's refusal of surgery came too late to allow a judicial determination of its necessity. The facts show that on November 8, 1968, which was about seven weeks post-injury, Dr. Mayer wrote a letter to defendant's claims representative, stating that the surgery had been recommended but plaintiff had failed to return for the next scheduled appointment. Dr. Mayer next saw plaintiff on December 20, 1968, which was about nine weeks post-injury, and again recommended surgery. It was on this occasion that plaintiff refused. Dr. Mayer's letter dated February 21, 1969 advises defendant that the surgery had been offered and refused.
The rationale of the jurisprudential rule stated above is that an employer, who seeks to avoid the payment of compensation on the grounds that the employee has refused surgery, has the burden of obtaining medical evidence that such surgery is reasonable and necessary, following which a firm tender of the medical treatment must be made by the employer to the employee and, finally, a judicial determination of these facts must be made before compensation payments are terminated. If time is limited, the burden is on the employer to take these steps in the time available.
Furthermore, in the present case, even assuming that Dr. Mayer's testimony is sufficient to show that the surgery was necessary and reasonable, the defendant did not make a firm tender of the medical treatment. There was time, after defendant's claims adjuster received Dr. Mayer's letter of November 26, 1968, to immediately investigate the matter and offer the surgery to plaintiff. Instead, defendant took no action whatever with reference to the recommended surgery.
PENALTIES AND ATTORNEY'S FEES
Defendant terminated compensation payments on the basis of Dr. Mayer's report of February 26, 1970, which states that plaintiff's permanent disability "should not prevent him from engaging in gainful employment." Defendant contends it was reasonable in construing this to mean that plaintiff was capable of returning to common labor.
Viewed in the context of Dr. Mayer's previous reports, it is obvious that he did not think plaintiff could return to the *50 type of work he was performing at the time of the accident. These previous reports state clearly that plaintiff could not raise his right arm above 60, and that this was a permanent condition. As stated above, such a worker is clearly unable to compete in the common labor market. Defendant's actions in terminating compensation were arbitrary, capricious and without probable cause.
By answer to the appeal, plaintiff requests that the $3500 award for attorney's fees be increased to cover his attorney's services in connection with this appeal. We think the request has merit and will increase the attorney's fees to $4,000.
AMOUNT OF PENALTIES
The judgment appealed orders "that defendant pay plaintiff penalties of 12% on all amounts due." This means that the penalty applies to all weekly compensation payments which are now due or will become due in the future. Defendant contends the penalty should apply only to weekly compensation payments more than 60 days overdue at the time of the judgment or which in the future become overdue more than 60 days.
We have construed LSA-R.S. 22:658, the penalty statute for insurers, to mean that the 12% penalty applies only to those weekly compensation payments which are overdue or in the future become overdue more than 60 days, Redding v. Cade, La.App., 158 So.2d 880 (3rd Cir. 1964). However, plaintiff contends that where the defendant is an uninsured employer, as in the present case, a different penalty statute controls, LSA-R.S. 23:1201.2, and the penalty applies to all past and future payments. Plaintiff cites Moore v. Pullig, La.App., 123 So.2d 826 (2d Cir. 1960), which supports his position.
There is no substantial difference between the cited statutory provisions applicable to insurers and those applicable to uninsured employers. With the exception of Moore v. Pullig, supra, the jurisprudence, including cases from our Supreme Court, uniformly holds that the penalty applies only to those weekly compensation payments which are overdue for more than 60 days or in the future become overdue for more than 60 days. See Redding v. Cade, supra. We are compelled to follow this construction.
AMOUNT OF INTEREST
The judgment appealed awards interest at the rate of 5% per annum on each past due installment from its due date until paid, which was formerly the rate of legal interest under LSA-C.C. Article 1938. By Act No. 315, Section 1 of 1970, the rate was increased to 7%, which is applicable here. The judgment must be amended accordingly.
For the reasons assigned, the judgment appealed is amended in the following respects: (1) Penalties of 12% must be paid only on those weekly compensation payments which are past due for more than 60 days or in the future become past due for more than 60 days. (2) The attorney's fees are increased from $3500 to $4000. (3) The rate of legal interest on each past due installment from its due date until paid is increased from 5% to 7%. Otherwise than as amended, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed, as amended.
HOOD, Judge (dissenting).
I cannot agree with some of the conclusions reached by my colleagues.
First, in my opinion the evidence does not show that plaintiff is totally and permanently disabled. There is no medical testimony to that effect. Dr. Mayer, the orthopedic surgeon who treated plaintiff, testified that although Thibodeaux has a ten percent permanent impairment of the right arm, "this should not prevent him from engaging in gainful employment."
*51 A review of all of the doctor's testimony shows that in his opinion Thibodeaux can perform all of the duties of his original employment, except that he "probably would have a little difficulty" in stacking 50 pound crates of potatoes "on a sustained basis." Dr. Mayer suggested that "he would probably have to use a system to lift the crate up" above waist height, and considering his other testimony on that subject I interpret that to mean that when heavy crates are lifted that high plaintiff would have to rely on his left arm to do most of the lifting. In any event, the doctor made it plain that plaintiff can do the work he originally performed.
Actually, I do not find that plaintiff was required to lift 50 pound crates of potatoes in his employment. The only occasion for lifting any correspondingly heavy weights, as I understand the evidence, was in stacking canned goods in trucks after they had been put on the trucks by machinery. Plaintiff's primary duty was to work as a "can strapper" and he also hosed down and swept the floors of the cannery. Neither of these duties, however, required any heavy lifting. One of his fellow employees had never seen plaintiff assist in stacking goods in a truck.
The evidence shows that plaintiff has been driving his own truck regularly since the date of the accident. He also owns a tractor, and he conceded in his testimony that he drives his tractor every day. In 1970, he assisted a neighboring farmer in harvesting potatoes. During that harvesting season he drove his tractor in the fields, and he used it to pull wagons loaded with potatoes as they were being picked or harvested. He admits that he has picked potatoes himself since the date of the accident, but he explains that he picks them with his left hand. Two witnesses testified that they observed plaintiff driving his tractor for several minutes on one occasion, and that he steered it solely with his right arm at that time, that being the arm which he claims is disabled. He uses his right hand in tying his shoes and in dressing himself. He plays cards regularly, and he apparently has had no difficulty in shuffling and dealing the cards. One of his regular card-playing friends stated that he has never noticed plaintiff favoring one arm over the other in handling the cards.
The evidence convinces me that plaintiff is entitled to compensation benefits based on a ten percent loss of use or function of his right arm, but that he is not totally and permanently disabled. Plaintiff has already been paid more than the amount of compensation benefits which are allowed for his disability.
I also disagree with my colleagues in their holding that defendant was required to make a "a firm tender" of the surgery or medical treatment which was needed, and that it is liable for compensation benefits because of its failure to make such a tender.
The evidence shows that Dr. Mayer, the treating physician, urged plaintiff to submit to surgery on November 8 and on December 20, 1968. On both of those occasions the doctor explained fully to plaintiff the need for and the reasonableness of the surgery. I think the evidence shows that plaintiff refused the surgery recommended by the doctor on both of those occasions. But, even if he refused it only on the last mentioned date, as recognized by the majority, the record is clear that his refusal was definite. There was never any question but that the surgery was available to him and was being offered to him at defendant's expense. Under those circumstances, I do not feel that the law requires that defendant go through the useless and vain procedure of making a formal tender and obtaining a judicial determination of the reasonableness of and the necessity for it. That is true especially in a case such as is presented here, where the surgery was needed immediately and the defendant did not have time within which to obtain a judicial determination of its reasonableness.
Since I am firmly convinced that plaintiff is not entitled to any additional compensation *52 benefits, I feel that defendant was not arbitrary or capricious in discontinuing the payment of such benefits, and that it should not be condemned to pay any penalties or attorney's fees at all.
Finally, assuming that penalties and attorney's fees are due, I do not feel that an increase in the award of attorney's fees is justified. The trial judge allowed $3,500.00 as attorney's fees, which is considerably more than the maximum attorney's fees allowed by LSA-R.S. 23:1141. The majority has increased that award to $4,000.00. There was nothing unusual or complicated about the litigation. The case apparently was tried in one day and the record is relatively short. I think this award of attorney's fees is excessive.
For these reasons, I respectfully dissent.